AMMER *v.* POSTAL.

1. MASTER AND SERVANT—NEGLIGENCE — DEFECTIVE ELEVATOR — INSPECTION—EVIDENCE.

In an action for personal injuries charged to have resulted from the fall of defendant's elevator that plaintiff claimed had previously given evidence of a defective and unsafe condition, the trial court erred in excluding answers to questions asked of plaintiff's expert witness, in support of the charge contained in his declaration as to defendant's failure to inspect the elevator, whether an inspection would have disclosed certain defects, how often the brakes and safety devices ought to be inspected, and how the inspection should be made.[1]

[1] Duty to employés as to inspection of elevator, see note in 21 L. R. A. (N. S.) 592.

2. SAME.

Nor should the court have directed a verdict for defendant for the alleged reason that there was no sufficient evidence of any neglect, upon testimony having a tendency to show that the elevator had failed to stop some four weeks prior to the injury, that the safety catch had been jarred and was fastened back, that the elevator twice dropped during the week before the accident, and also a few hours previously.

3. SAME.

Plaintiff could not be required to show by direct testimony what was the specific defect that caused the improper working of the elevator.

Error to Wayne; Rohnert, J.   Submitted November 21, 1911.   (Docket No. 156.)   Decided February 10, 1912

Case by Christian W. Ammer against Fred L. Postal and Austin E. Morey for personal injuries.   A judgment for defendants on a verdict directed by the court is reviewed by plaintiff on writ of error.   Reversed.

*Eugene L. Mistersky* and *James A. Murtha* (*John H. Dohrman*, of counsel), for appellant.

*Luman W. Goodenough*, for appellees.

STEERE, J.   This action is brought by plaintiff to recover damages for personal injuries sustained on July 16, 1905, while in the employ of defendants, engaged in running an electrical passenger elevator in the Griswold House in the city of Detroit, of which hotel defendants were proprietors.

Plaintiff's declaration is in proper legal form, with the usual allegations and averments in general terms, charging failure on the part of defendants to provide reasonably safe appliances with which to operate the elevator, failure to inspect and keep the same in repair, a generally unsafe and defective condition, and particularly that the brake and safety catch appliances of said elevator became out of repair, defective, and unsafe, of which fact defendants

had due notice, by reason of which, while plaintiff was operating the elevator in a proper manner and with due care, it dropped a distance of five stories to the basement, inflicting on him serious and permanent injuries.

Defendants pleaded the general issue with the statute of limitations added, against objection, at the trial. The latter plea was not passed upon by the trial court, and is not properly presented by the record or briefs for consideration here.

The case was tried in the Wayne county circuit court before a jury. At the conclusion of plaintiff's testimony, the trial judge, of his own motion, directed a verdict for defendants on the ground that plaintiff had failed to produce sufficient evidence of defendants' negligence to justify submitting the same to a jury, stating that it would be absolute speculation and conjecture on their part as to what caused the accident. Plaintiff's assignment of error is the ruling of the court that the testimony was only speculative, followed by taking the case from the jury and directing a verdict in favor of defendants. It therefore becomes necessary to ascertain if there was any competent evidence produced by plaintiff of defendants' negligence in the particulars alleged in the declaration.

Plaintiff testified that he had worked on elevators off and on for 16 years, had operated electric elevators before, but was not a mechanic and did not understand their construction and machinery, except that he knew how to start and stop them, and cut off the electric current, and do other things proper for their operation. He first had trouble with this elevator four weeks before the accident, when he could not get down from the sixth floor without help from the engineer, having gone up against the beams, which jarred or sprung the safety catch. He told the manager and informed him that he did not know how to set the safety catch; reported it to the engineer, who looked after the elevator. The catch was tied back with a piece of rope and wire. He was shoved up against the beams four different times. About two weeks after the

first trouble, he wanted to stop at the dining-room floor and could not, but slid to the basement at about full speed, breaking mirrors on each side of the car: on day of accident picked up a passenger on fifth floor, tried to stop at fourth, but brake did not act, worked controller to stop, and turned off the current without effect, and dropped five floors to the basement: on Saturday before accident had trouble with the car. It slid too much even without anybody in it but himself. After the accident, two cables were loose at the top of the car, hanging down, and later on the elevator man opened the controller box, and about two handfuls of copper dust fell out of the box.

A witness named James Luck testified that he worked at night on the Griswold House elevator in July, 1905; that it did not run the night following the accident to the plaintiff. It slid with him two or three days before the accident, slid from the second floor to the basement and went down with a bump. Reported this occurrence to the head clerk of the hotel.

A witness named Harry Byam was bell-boy at the hotel, and among other things it was his duty to run the elevator when it was necessary to relieve plaintiff. He operated it two or three times at intervals on the day of the accident, relieving the plaintiff for from five to fifteen minutes at a time. While coming down from the sixth floor with a passenger, he tried to stop at the dining-room floor, but the elevator would not stop and ran down to the basement, from which it had to be pushed up. Witness was in the car with plaintiff at the time of the accident, getting on at the fifth floor: noticed that the elevator was uncontrollable when the plaintiff tried to stop it at the fourth floor, throwing the lever back in position to stop the car, and then throwing it the other way and back up again, and then turning off the electricity, but the car went on down just the same as fast as it could go. After that the machinery was repaired. Witness saw them take part of the clutch on the pulley wheel apart, on top and underneath—the friction plate.

Thomas West, an electrician, testified that he had been engaged in the business for 14 years; understood the construction of the Otis electric elevator; had been employed as electrician by the Public Lighting Commission and the Majestic Building. After qualifying as an expert witness, he was examined at length regarding the construction of electric elevators in general, and the one in which the accident occurred in particular; he having personally examined it. During his examination he demonstrated the construction and action of the brake and some other parts of the elevator on the blackboard before the jury. To a hypothetical question as to what condition would cause the car to drop, he said:

"If the friction plate is not properly adjusted to allow the springs to work so that it will pull it up against the pulley, the weight of the car will have a tendency to overcome the friction on the pulley, and the car would slide. That is caused by improper adjustment of the largest nuts or the wearing out of the leather on the inside of the clutch. * * * Also, if the brake or clutch spring refused to work, and the car got to a speed sufficient to throw the clutch in on the bottom of the car, that would stop it. If the clutch did not work, or the brake did not work, it would show a defective covering of the clutch; a defective covering, or a defect in the clutch itself, or both."

. In the examination of this witness the court took an active part, asking numerous leading and sometimes argumentative questions, to which counsel at times objected. During the examination of the witness as to what conditions might cause the accident, the following occurred:

"*The Court* (continuing): Then either the car did not go fast enough to throw it out—just a moment—either the car did go fast enough to throw the governor out, or else there was no covering there, or it was out of repair?

"*A.* Yes, sir.

"*The Court:* One of those three conditions?

"*A.* Yes, sir.

"*The Court:* And you don't know which one?

"*A.* No, sir.

"*The Court:* Now, you see that is what I am trying to illustrate; it is speculation. * * *

"*Juror:* Can I ask a question?

"*The Court:* Yes.

"*Juror:* Does the controlling lever ever get out of repair so that it don't shut the current off as they move it from one position to another?

"*A.* Yes, sir.

"*Juror:* What effect does that have upon the elevator, if the current was not shut off on the way down?

"*A.* Well, it would strike pretty hard; at the bottom it would stop itself automatically.

"*Juror:* What makes it stop there?

"*A.* There is an automatic trip.

"*Juror:* Suppose the controller did not shut off the current, would that still shut it off?

"*A.* Yes, sir.

"*By Mr. Goodenough:* Suppose the automatic were out of order too, what then?

"*A.* Well, then it is time they had them fixed, if they are both out of order.

"*The Court:* That is what I call a smart answer. You are too bright a man to give such an answer as that. The question is what would happen?

"*Mr. Goodenough:* What would be the effect if the automatic were out of order?

"*A.* The brake would set itself; you could not run the car with the automatic out of order.

"*Q.* If the automatic was out of order and the controller was out of order and did not shut the current off—

"*The Court:* There are two automatics—one is controlled from the car and the other is controlled by pulling a cable. * * *

"*The Court:* Mr. West, I want to ask you one question. The safety brake that stops the car, that is not a safety brake, but a regular brake and gears—that may not work because it may be out of order or not properly adjusted.

"*A.* Yes, if it is not properly adjusted, it is out of repair. * * *

"*The Court:* Suppose there is something wrong with the controller by which the motor could not stop, that would have a tendency to let it go down faster?

"*A.* There is a controller with safety device to overcome that.

"*Q.* There might be something wrong with the controller by which the power would be put on, and you could not shut it off, and the car would continue to go down?

"*A.* Yes, sir.

"*Q.* So that might cause the car to go down?

"*A.* Yes, sir."

While the court was conducting a somewhat lengthy examination, the following occurred: Mr. Dohrman, objecting, said:

" I don't believe your honor understands this man.

" *The Court:* I understand him fully if I understand anything. In the first place, let me ask you a few questions. In the first place, witness, if the clutch is out of repair, it would not permit the clutch to grab and stop the elevator, would it, and it would slide down if the clutch—

"*A.* Do you mean the brake or the safety clutch?

" *The Court:* If it was not adjusted properly, it would tend to let it go down?

" *A.* Yes.

" *The Court:* So, also, if there was—there might have been something in the controller which was out of kilter and which would prevent the controller from controlling the descent of the car, or the current, and that might bring it down. Now, there are three conditions. * * *"

There are several pages of the record indicating that the court trespassed upon the province of counsel in the examination of this witness, and was obliged to make rulings upon his own questions, manifestly finding it difficult to be impartial in that particular.

One of the allegations of negligence in plaintiff's declaration is failure to make proper inspection. To sustain that allegation, the following questions were asked of the witness West, and objections thereto sustained:

"*Q.* I ask you with reference to an inspection, the causes which you have mentioned—and mentioned by the court—could they be discovered upon inspection?

"*Q.* What is your experience as to inspection of braking devices and safety devices on Otis elevators?

"*Q.* How often do you inspect brakes and safety devices on elevators?

"*Q.* How often in your opinion should brakes and safety devices on elevators be inspected to render them safe and reliable ?

"*Q.* Do you know, Mr. West, the manner and method of the inspection of elevators ?

"*Q.* Do you know how often such devices should be inspected ?

"*Q.* Would an inspection have disclosed the defects which you have mentioned in your answers ?

" *The Court:* They would if they had been there at the time of the inspection; I will answer that for you. If they were not there at the time of the inspection, it would not have disclosed it. They would if they were there at the time of the inspection. If they were not there, they would not be disclosed. I will answer for you."

To these rulings of the court exception was duly taken. We think the proposed testimony should have been allowed, and its exclusion was error.

We think there was testimony to go to the jury under the claim of plaintiff that the cause of the accident was a defective condition of the friction brake and safety clutch —one or both. The record contains testimony that four weeks before the accident complained of plaintiff was "shoved up above the limits" and against the beams so that he could not get down without the aid of the engineer; that this jarred the safety catch; that this was reported to the manager and engineer whose duty it was to look after the elevator; that at that time the safety catch was tied back with a rope and a loop of wire; that later the elevator slid from the dining-room floor to the basement, breaking mirrors on each side of the car; that the Saturday before the accident it slid again, and again some few hours before the accident, while Byam was operating it, it slid three floors to the basement, where it stuck so that he had to be pushed up. Luck testifies that two or three days before July 16th it slid from the second floor to the basement while he was operating it, which occurrence he reported to the head clerk. This is not a case in which the machinery worked well before and after an accident which was unexpected and unexplained. There

is some evidence in the present case tending to show that the elevator had been out of order, that its working was spasmodic and unreliable, and that defendants had notice of it; even though it may be slight, it was sufficient to carry the case to the jury, whose province it is to determine, under proper instruction, what reasonable inferences, if any, it affords as to defendants' negligence in not inspecting and keeping the same in repair. *Redmond* v. *Lumber Co.*, 96 Mich. 545 (55 N. W. 1004).

While negligence cannot be inferred from the bare accident, or guilt found upon mere speculation and conjecture, without facts from which reasonable and logical inferences can be drawn, recovery is not limited to those cases where plaintiff can produce direct testimony of the specific defect in a certain part of the mechanism, or "diagnose the particular cause of inefficiency and prescribe the remedy." *Casterton* v. *Blower Co.*, 142 Mich. 407 (106 N. W. 61); *Wilson* v. *Woodenware Co.*, 152 Mich. 540–546 (116 N. W. 198).

The judgment is reversed, and a new trial ordered.

MCALVAY, BROOKE, BLAIR, and STONE, JJ., concurred.